# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>1302 North Lombard Drive<br>Anaheim, California 92801 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 8:20-MJ-00641

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | See attached Affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ryan J. McDuffy, ATF Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Santa Ana, CA</u>

_____
*Judge's signature*

Honorable Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: B. Lichtman, x3530

### **A F F I D A V I T**

I, Ryan McDuffy, being duly sworn, hereby declare and state as follows:

### I. **INTRODUCTION**

1.    I am a Detective with the Brea Police Department ("BPD") and also a federally deputized Task Force Officer ("TFO") presently working with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  As a TFO with the ATF, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.    I am assigned to the ATF Orange County Violent Crime Task Force ("OCVCTF").  The OCVCTF is responsible for, among other things, investigating violations of federal law involving criminal street gangs, possession of firearms by prohibited persons, possession of stolen firearms, possession of machineguns, the illegal distribution of firearms and narcotics, and burglaries and violent crime, including robberies.  Prior to this assignment with the ATF, I was a BPD Police Officer and have been so employed since 2015.

3.    I have specialized training and experience in investigations of narcotics trafficking and criminal street gangs.  During my tenure as a Police Officer, as well as an ATF TFO, I have conducted and participated in numerous investigations of criminal activity, including, but not limited to robberies.  Since joining the OCVCTF in 2018, I have

specialized in investigations of robberies, firearms violations, drug trafficking, and gang activity.  I have participated in the execution of numerous federal and state arrest and search warrants during my career.

## II. PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of the following:

a.   A criminal complaint charging GLEN ALEXANDER LARRABEE, JR. ("LARRABEE") with unlawfully possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), as well as an associated arrest warrant;

b.   An application for a warrant to search LARRABEE's residence located at 1302 North Lombard Drive, Anaheim, California 92801 (the "SUBJECT PREMISES");

c.   An application for a warrant to search LARRABEE's black 2017 Dodge Challenger bearing California license plate 8FPZ902 and Vehicle Identification Number ("VIN") 2C3CDZAG5HH589012 (the "SUBJECT VEHICLE"); and

d.   An application for a warrant to search LARRABEE's Samsung Galaxy S9+ cellular phone, which is in BPD custody (the "SUBJECT DEVICE").

5.   The facts set forth in this affidavit are based upon information obtained from other law enforcement personnel, my personal knowledge, and my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and in part only.

### III.  PREMISES TO BE SEARCHED

6.    The locations to be searched are described as follows:

a.    The residence to be searched is located at 1302 North Lombard Drive, Anaheim, California 92801 (the "SUBJECT PREMISES"), as described further in Attachment A-1, which is incorporated herein;

b.    The vehicle to be searched is a 2017 black Dodge Challenger, bearing California license plate 8FPZ902 and VIN 2C3CDZAG5HH589012 (the "SUBJECT VEHICLE"), as described further in Attachment A-2, which is incorporated herein; and

c.    The digital device to be searched is a Samsung Galaxy S9+ bearing serial number R28K3388XSL (the "SUBJECT DEVICE"), in BPD custody, as described further in Attachment A-3, which is incorporated herein.

### IV. ITEMS TO BE SEIZED

7.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition), as set forth more fully in Attachment B, which is incorporated herein by reference.

### V.  SUMMARY OF PROBABLE CAUSE

8.    On September 16, 2020, a BPD Officer conducted a traffic stop on LARRABEE, and a police canine alerted to LARRABEE's vehicle.  During a subsequent search of LARRABEE's vehicle, officers found a backpack containing a Glock firearm

- 3 -

loaded with six rounds of ammunition, as well as a magazine
loaded with an additional six rounds of ammunition.  As
explained below, at the time, LARRABEE was a convicted felon and
the gun traveled in interstate commerce.

9.    Less than 24 hours after his arrest by BPD officers,
LARRABEE was released on bond.  Because LARRABEE has already
used the SUBJECT VEHICLE to store a firearm and ammunition at
the time of his arrest, there is probable cause to believe that
further evidence of his unlawful possession of such items will
be found in the SUBJECT VEHICLE.  Furthermore, officers also
located in the SUBJECT VEHICLE a receipt (dated September 3,
2020) from a gun store for the purchase of a high-capacity, 30-
round ammunition magazine for a 7.62 x 39 caliber rifle.
However, officers did not locate that ammunition magazine or a
firearm of that caliber in the SUBJECT VEHICLE.  Therefore,
there is probable cause to believe that evidence of LARRABEE's
unlawful possession of a firearm and ammunition will be found in
the SUBJECT PREMISES and the SUBJECT DEVICE.  Additionally,
individuals who illegally possess firearms and ammunition often
keep evidence of their possession in their residences, their
vehicles, and on their cell phones.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    September 16, 2020 Arrest of LARRABEE

10.    I have reviewed police reports prepared by BPD
Officers M. Luera and W. Huang regarding the incident occurring
on or about September 16, 2020, involving the arrest of
LARRABEE.  Based on my review of the reports and my discussion

- 4 -

of the case with Officer Luera, I have learned the following facts:

11.  On September 16, 2020, Officer Luera was working in a uniformed patrol capacity in a marked BPD vehicle in the city of Brea.  At approximately 9:34 p.m., Officer Luera was patrolling the area of Imperial Highway and Berry Avenue when he encountered a black Dodge Challenger bearing California license plate 8FPZ902 (the "SUBJECT VEHICLE").  Officer Luera conducted a record check of the vehicle's registration and discovered it was expired.  Officer Luera also noticed the vehicle did not have a front license plate affixed.  The vehicle was registered to LARRABEE.

12.  During the records check of the SUBJECT VEHICLE's registration, Officer Luera received a National Crime Information Center ("NCIC") alert from the U.S. Border Patrol. The alert stated that the SUBJECT VEHICLE was "seized pending forfeiture" and contained a direction to contact Border Patrol.

13.  Before Officer Luera conducted a traffic enforcement stop, the SUBJECT VEHICLE made a quick left into a shopping center located at 305 West Imperial Highway, Brea, California, proceeded to accelerate, and made an abrupt stop.

14.  After Officer Luera activated his overhead emergency lights, the driver and sole occupant of the SUBJECT VEHICLE (later identified as LARRABEE) immediately exited his vehicle. Officer Luera ordered LARRABEE to get back into his vehicle multiple times before LARRABEE complied.

15.   Officer Luera believed based on his training and experience that it was uncommon for a driver to exit their vehicle during a traffic stop before being contacted by an officer.  It appeared to Officer Luera that LARRABEE was attempting to distance himself from the vehicle.

16.   Officer Luera identified LARRABEE through his California driver's license.  He asked LARRABEE if he had any weapons inside the vehicle such as firearms and LARRABEE stated he did not.

17.   LARRABEE told Officer Luera that he lived in Anaheim and that he was in Brea conducting business via Door Dash, a food delivery service.  Officer Luera noted that the shopping center in which this traffic stop occurred had no open restaurants at the time.

18.   Officer Luera asked LARRABEE about the U.S. Border Patrol alert on the SUBJECT VEHICLE and LARRABEE stated he had allowed someone to rent his vehicle and the person who rented this vehicle went to Mexico and was caught smuggling illegal aliens across the border.

19.   Officer Luera conducted a records check and learned that LARRABEE had been arrested for burglary in 1999 and that he had also been arrested for being a felon in possession of a firearm in 2009, and later convicted of that offense.

20.   While he conducted the records check, Officer Luera requested the assistance of a drug detection dog.  BPD Canine Officer Hunziker arrived at the traffic stop and conducted a

drug sniff using his canine partner.  The canine alerted to the SUBJECT VEHICLE.

21.  Officer Luera then conducted a search of the SUBJECT VEHICLE and found a black and red backpack on the front passenger floorboard.  Inside the backpack, Officer Luera located a Glock Model 42, .380 caliber pistol bearing serial number ACBE985.  The firearm had a loaded magazine of six rounds inserted.  Additionally, there was a second magazine containing six rounds in the same pocket of the backpack, next to the gun. Officer Luera also noticed numerous spent ammunition shell casings in plain view in the backseat and back passenger floorboard.

22.  Officer Luera located numerous personal medical documents in the backpack that appeared to belong to LARRABEE. These documents, which contained LARRABEE's name and date of birth, were located in the large pocket directly behind the firearm recovered.

23.  As the search of the SUBJECT VEHICLE continued, Officer Luera located a receipt from a North Las Vegas firearms retailer for a high-capacity, 30-round 7.62 x 39 caliber ammunition magazine that was purchased using LARRABEE's credit card[1] on September 3, 2020.  However, this ammunition magazine was not located in the SUBJECT VEHICLE.  Nor was any firearm

---

[1] LARRABEE's credit card was discovered to have been used to purchase the 7.62 X 39 caliber magazine through additional investigation and comparing the credit card in LARRABEE's possession with the credit card used on the copy of the receipt.

which matched the caliber of the ammunition purchased located in the SUBJECT VEHICLE.

24.  In the trunk of the SUBJECT VEHICLE, officers also located a Winchester ammunition box that contained 12 rounds of .380 caliber ammunition, the same caliber as the Glock pistol.

25.  The SUBJECT DEVICE was located on a mount inside the SUBJECT VEHICLE.

26.  The above items, including the SUBJECT DEVICE, were all collected as evidence, and LARRABEE was arrested and transported to the BPD jail.  Following his arrest, LARRABEE was released on bond.  According to information from the Orange County Sheriff's Department, LARRABEE was released on September 17, 2020 at approximately 7:56 p.m.  He was therefore in custody for less than 24 hours following his September 16, 2020 arrest.

27.  After LARRABEE's arrest, the SUBJECT VEHICLE was impounded.  However, On September 19, 2020 LARRABEE retrieved his vehicle from the impound.

**B.   Trace of the Glock Possessed by LARRABEE**

28.  Officer Luera performed a query of the Glock Model 42 pistol possessed by LARRABEE in the California Automated Firearms System ("CA AFS").  The query revealed that there was no record for this firearm as of September 16, 2020.  California law requires any firearm sold, purchased, or possessed in the State of California to be entered into CA AFS.  Furthermore, the Glock Model 42 pistol possessed by LARRABEE was not reported stolen in NCIC.  Based on this information, and my discussions with other ATF special agents assigned to the OCVCTF, I know

- 8 -

that this absence of a CA AFS record for a firearm recovered in California is often indicative of the firearm having been purchased in another state.

29.   On September 17, 2020, I reviewed an ATF trace summary of the Glock Model 42 pistol possessed by LARRABEE and learned that the pistol was originally purchased by another individual in Montana in 2016.

### C.   Interstate Nexus

30.   On September 17, 2020, I forwarded information regarding the Glock firearm recovered from LARRABEE's vehicle to ATF Special Agent Jeff Davis, an interstate nexus expert.  SA Davis determined the Glock firearm recovered from LARRABEE was manufactured in Georgia, and that because it was recovered in California, it must have moved in interstate commerce.

### D.   LARRABEE's Criminal History

31.   I have reviewed LARRABEE's criminal history for felony convictions.  Based on my review of those records, I have learned that LARRABEE was convicted of the following felony offenses on or about the dates specified below:

a.   On January 3, 2000, for burglary and forgery, in violation of California Penal Code ("CPC") §§ 460(A) and 470(A), in Orange County Superior Court, Case No. 99NF3302, for which he was sentenced to 365 days in jail and 3 years' probation; and

b.   On September 19, 2011, for felon in possession of a firearm, in violation of CPC § 12021(A)(1), in Orange County Superior Court, Case No. 09SF0687, for which he was sentenced to 32 months in prison.

### E.   LARRABEE's Residence

32.   According to CA DMV records, on March 2, 2016 LARRABEE provided his address of record for his driver's license as the SUBJECT PREMISES.

33.   The SUBJECT VEHICLE was also registered with CA DMV to LARRABEE at the SUBJECT PREMISES from July 16, 2019 through July 16, 2020.[2]

34.   Based on entries in LARRABEE's criminal history record, LARRABEE has used the SUBJECT PREMISES as his address of record since at least 2009.

35.   Following his September 16, 2020 arrest by BPD officers, LARRABEE provided the SUBJECT PREMISES as his address during the booking process.

36.   On September 21, 2020, at approximately 7:50 a.m., BPD Detective E. D'Huart, who is also assigned to the OCVCTF, observed LARRABEE exit the SUBJECT RESIDENCE and drive away in the SUBJECT VEHICLE.

### F.   Training and Experience Regarding Evidence of Firearms Possession in a Trafficker's Vehicle, Residence and Cellular Telephone

37.   Based on my training and experience, and because he previously used his vehicle to store a firearm and ammunition, there is probable cause to believe further evidence of LARRABEE's firearm and ammunition possession will be found in a search of the SUBJECT VEHICLE.

---

[2] As noted above, the registration on the SUBJECT VEHICLE has since expired and LARRABEE has not yet renewed it, according to CA DMV records.

38.   Based on my training and experience, I also know that
individuals who are prohibited from possessing firearms often
keep firearms and evidence of their possession at their
residence and on their cell phones.  In particular, when
individuals (like LARRABEE) are prohibited from possessing
firearms but are no longer subject to a form of supervised
release (e.g., probation or parole), they often feel more
comfortable about keeping firearms, ammunition, and evidence of
their criminal possession at their residence and on their cell
phone than they would have during their period of supervision.
Such evidence can be found in the form of, but not limited to,
the following items:  pictures, receipts, gun cases, ammunition,
holsters, and ammunition magazines.  Since the residences are
where these individuals often spend the most time and keep their
possessions, it is common to find evidence of their illegal
activity there.  Furthermore, I know based on my training,
experience, and discussions with other investigators, that it is
common for criminals who illegally possess firearms to have more
than one firearm.

39.   I know based on my training and experience, as well as
my discussions with other experienced investigators, that
individuals who illegally possess firearms and ammunition often
keep evidence of their illegal activity on their cell phones.
Such evidence is in the form of, but not limited to, the
following:  digital images of firearms or ammunition stored on
their cell phones, sometimes of the defendant(s) posing with
firearms; stored messages and communications with others

- 11 -

discussing and arranging the illegal transfer or acquisition of firearms or ammunition; stored location data pertaining to locations where firearms or ammunition were acquired or may be stored; and internet searches for firearms, ammunition, and firearm accessories.

40.  In this case, LARRABEE not only possessed a firearm and ammunition in the SUBJECT VEHICLE at the time of his arrest, but officers also located in the SUBJECT VEHICLE the receipt (dated September 3, 2020) from a gun store in North Las Vegas, Nevada for the purchase of a high-capacity, 30-round ammunition magazine for a 7.62 x 39 caliber rifle, like an AK-47.  However, officers did not locate a firearm of that caliber or the ammunition magazine listed on the receipt in the SUBJECT VEHICLE.

a.  Through a review of law enforcement databases, I learned that the SUBJECT VEHICLE was captured by an automatic license plate reader camera in North Las Vegas, Nevada on September 1, 2020.

b.  Based on my training and experience as an ATF TFO and being assigned to the OCVCTF, I know that individuals in California who are prohibited from possessing firearms and ammunition will often travel to nearby states like Arizona and Nevada to illegally acquire firearms or ammunition due to the less stringent firearms laws in those states.

## VII. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

41.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.  Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in

- 13 -

the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.

Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents

- 15 -

(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a

controlled laboratory environment, and also can require
substantial time.

f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a

process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

42.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VIII.     <u>CONCLUSION</u>

43.   For all the reasons described above, there is probable cause to believe that LARRABEE has committed a violation of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm and ammunition).  Similarly, for the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 922(g)(1), will be found in a search of the SUBJECT PREMISES, SUBJECT VEHICLE, and SUBJECT DEVICE, as described in Attachments A-1, A-2, and A-3.


_____
Ryan J. McDuffy
Task Force Officer, ATF
Detective, BPD


Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
22nd day of September, 2020.

_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The residence located at 1302 North Lombard Drive, Anaheim, California 92801 ("SUBJECT PREMISES"), including all rooms, attics, basements, any places located therein, and any porches, balconies, garages, carports, storage rooms, containers, and outbuildings specifically on the premise property, associated with, or assigned to, the residence, and any vehicles parked in the garage or driveway specifically associated with, or assigned to, the residence.

The SUBJECT PREMISES is further described as a single-level, single-family residence blue in color with white trim, a white garage door, and a gray composite roof.  The front door has a white security screen door and is to the right (south) of the garage door.  The residence is the third house south of West Chevy Chase Drive on the east side of Lombard.  The numbers "1302" are painted in black on the curb in front of the residence.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g)(1) (felon in possession of firearm and ammunition) namely:

      a.   Firearms and ammunition;

      b.   Firearms accessories, parts, and parts kits, including upper receivers, barrels, trigger mechanisms, stocks, holsters magnets, bullet button locks, sights, forward pistol grips, and bi/tripods;

      c.   Finished and unfinished firearm lower receivers;

      d.   Items used for the storage or display of firearms, including but not limited to display cases, safes, and other storage containers;

      e.   Documents or other items showing occupancy, ownership, or rental of the SUBJECT PREMISES, including addressed envelopes, utility bills, telephone bills, rent receipts, keys, or items with labeled or personalized names (not to exceed ten such items).

      f.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

      g.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

- 23 -

        i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.   records of or information about Internet Protocol addresses used by the device;

        ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

- 24 -

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

- 28 -

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.